# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARK RILEY,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:21-cv-00924** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | **Magistrate Judge Elizbeth P. Deavers** |
| | : | |
| **GENERAL MOTORS LLC,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter is before the Court on GM's Motion to Exclude the Opinions and Testimony of Plaintiff's Expert Darren Manzari (ECF No. 43); GM's Motion for Summary Judgment (ECF No. 46); and Plaintiff's Motion for Class Certification (ECF No. 36). For the reasons explained below, GM's Motion to Exclude is **GRANTED IN PART AND DENIED IN PART**; GM's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**; and Plaintiff's Motion for Class Certification is **GRANTED**.

## I.  BACKGROUND

### A.  Factual Background

Like many before it, this case arises out of a vehicle malfunction. Here, a "Shift to Park" message appears on the vehicle's dashboard directing the driver to shift their vehicle to park. While such a message can be helpful at times, for a certain subset of vehicles, this message appears despite the vehicle already being in park. As a result, when this occurs, one must spend "several minutes" "putting [the vehicle] back in gear and driving it around or restopping again" in order to get the vehicle to detect that the shifter is indeed in park. At its worst, this malfunction prevents users from turning the vehicle's lights and other accessories off, thereby draining the vehicle's

1

battery and putting the driver at risk of being stranded, or puts the vehicles at risk of being stolen because the vehicle will not detect that it is in park and therefore will not turn off.

One individual experiencing this issue, what this Court will call the "Shifter Issue," is Mark Riley. Mr. Riley purchased a 2017 GMC Acadia from an Ohio dealership in June 2016. (ECF No. 36-1 at 9). His vehicle, like most, came with a 3-year/36,000 mile new vehicle limited warranty ("Limited Warranty") under which customers can "take the vehicle to a GMC dealer facility" to "correct any vehicle defect … occurring during the warranty period." (ECF No. 1 at 8-9). Mr. Riley began experiencing the Shifter Issue within a few months of purchasing his vehicle and the issue manifests "several times a week" and as many as five to six times per week. (*Id.* at 9; ECF No. 36-1 at 9). For example, during one occurrence of the Shifter Issue, Mr. Riley says he "pulled in my driveway, and because I was going back out somewhere afterwards, I just made sure I had the emergency brake on, and I left the vehicle on because I couldn't get it to turn off." (ECF No. 36-1 at 10 n.9).

Because his car was still within the Limited Warranty, he took his car to the dealership to service this issue on multiple occasions over a period of two-and-a-half years. (*Id.* at 10; ECF No. 1 at 10). At times, the dealership noted his complaint but explained it did not have a fix just yet; another time, the dealership attempted a repair under General Motors' guidance, but the Shifter Issue was back "within a week or two." (ECF No. 1 at 10; ECF No. 36-1 at 10). Without a long-lasting repair, the Shifter Issue continued to manifest past the expiration of Mr. Riley's Limited Warranty, at which point he was to bear the cost of repair—a repair not available to him when this same issue occurred multiple times during the warranty period. (ECF No. 36-1 at 10-11; *see also* ECF No. 1 at 10).

As GM knows, Mr. Riley is not alone in facing the Shifter Issue. (ECF No. 1 at 6-8; ECF No. 36-1 at 4-6) (collecting public consumer complaints). Accordingly, GM issued guidance to dealerships at various stages of its investigation into the Shifter Issue. Some of this guidance, which comes in the form of Technical Service Bulletins, simply provided awareness of the issue (TSB No. PIT5616A), while some attempted solutions (TSB No. 18-NA-297). But the Shifter Issue continued despite the October 2018 TSB's suggested fix, resulting in a revised attempt in September 2019 in which GM directed dealers to a different potential underlying problem and thereby providing a different solution (TSB No. 19-NA-206). But the efficacy of this September 2019 guidance is in question here, as Mr. Riley and others received this fix but the Shifter Issue came back once again. (ECF No. 1 at 7-8). As such, over three years after Mr. Riley and others began purchasing their vehicles, GM had yet to provide a permanent solution to a recurring problem that impacts the baseline operation of their vehicles. Indeed, customers continued to experience the same problem at least through the parties' class certification briefing. (ECF No. 36-1 at 8 n.7).

## B.  Procedural History

As a result of this inconvenience, Mr. Riley, now "Plaintiff," filed suit against GM on behalf of himself and other similarly situated Ohio residents for damages or equitable relief based on breach of contract, breach of express warranty, breach of implied warranty of merchantability, and/or breach of warranty under the Magnuson-Moss Warranty Act. (ECF No. 1 at 14-19). GM first sought to dismiss Plaintiff's complaint in its entirety, which this Court denied in March 2022. (ECF Nos. 7, 17). In its subsequent answer, GM denied all of Plaintiff's claims and raised twenty one affirmative defenses. (ECF No. 21). The parties opted to defer any serious talks of mediation until after a class certification ruling, which the parties briefed in full. (ECF Nos. 36, 42, 47).

During class certification briefing, GM sought to exclude Plaintiff's expert's testimony in full (ECF No. 43) and moved for summary judgment (ECF No. 46). As briefing on both of those motions is complete, all three motions are ripe for review.

## II. MOTION TO EXCLUDE

As the admissibility of Plaintiff's only expert would bear on both summary judgment and class certification, this Court first considers GM's motion to exclude.

### A. Legal Standards

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-91 (1993). The decision of whether an expert's opinion is admissible under this standard is "left to the sound discretion of the trial court," *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993), in which the court acts as a "gatekeeper," *Daubert*, 509 U.S. at 592-93.

### B. Analysis

In broad strokes, GM argues that this Court should exclude the testimony and opinions of Plaintiff's expert, Darren Manzari, due to (1) Manzari's lack of relevant "knowledge, skills, or experience" as to economics, damages, and safety and (2) the opinions' failure to meet Rule 702 standards on account of insufficient factual underpinnings and inappropriate speculation or conclusions. (ECF No. 43 at 1-2). Before evaluating GM's challenges to each of his opinions, this Court starts with an evaluation of Manzari as an expert more generally.

In opposing GM's motion, Plaintiffs assert that "Manzari has the necessary training, qualifications, and experience to support the opinions set forth in his expert report, which are based

4

on a reliable methodology," and point to other courts' acceptance of such. (ECF No. 48 at 1 (citing *Grover v. BMW of N. Am., LLC*, 2022 WL 205249, at \*6-7 (N.D. Ohio Jan. 24, 2022); *Harris v. BMW of N. Am., LLC*, 2020 WL 7318087 (E.D. Tex. Dec. 11, 2020); *Baker v. BMW of N. Am., LLC*, 2021 WL 1577837, at \*5 (E.D. La. Apr. 22, 2021))); *see also Loy v. BMW of N. Am.*, No. 4:19-cv-00184, 2022 WL 2340568, at \*6 (E.D. Mo. June 29, 2022); *see, e.g.*, *Bryant v. BMW of N. Am., LLC*, No. 19-cv-0050, 2022 WL 420874, at \*4 (E.D. Wis. Feb. 11, 2022); *Mize v. BMW of N. Am., LLC*, 2:19-cv-7-Z-BR, 2021 WL 5571165, at \*5-6 (N.D. Tex. Oct. 1, 2001).

In summary, Manzari's diverse career and training spans different facets of the automotive industry over thirty-five years. (ECF No. 43-3 at 3-4; ECF No. 43-3, Ex. A). Manzari applied this experience in his expert report, tailoring his opinions and conclusions based a variety of relevant documents, including numerous GM statements, reports, and service bulletins to dealers, as well as documents produced by GM itself, including Plaintiffs' vehicle service records.[1] (*Id.* at 4-5). As such, this Court agrees with prior evaluations of Manzari's credentials and methodology of applying "his knowledge and experience to a review of an extensive list of relevant documents" as "sufficient to satisfy the Court's gatekeeping function." *Grover* \*7 (citing *Harris v. BMW of N. Am., LLC*, 4:19-cv-16, 2020 WL 7318087, at \*4 (E.D. Texas Dec. 11, 2020)). Such is the case even to the extent that his findings are "somewhat conclusory." *Id.* Understanding this, this Court now separately addresses the opinion-specific challenges.

---

[1] Manzari refers to the document production by bates numbers instead of description, but the substance of his report illuminates what that document production includes. (*See, e.g.*, ECF No. 43-3 at 19-22).

1. *Opinions 1 and 2: Manzari's opinions that GM took too long to diagnose and identify a repair for the Shifter Defect, and failed to cure the Shifter Defect*

GM asserts these opinions lack scientific analysis, and instead "simply summarize[] GM testimony, improperly couched as his opinion," so such opinions should be inadmissible as unreliable. (ECF No. 43-1 at 15).

These opinions are a result of Manzari's "interpretation of … record evidence" based on his relevant and qualified experience and knowledge. The factual foundation of GM's own documents and testimony cannot be questioned, (*contra* ECF No. 43-1 at 18), and such a review is reliable, *see Harris*, 2020 WL 7318087, at *5. This Court is not persuaded by the contention that Manzari did no analysis but, regardless, an "expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. 592. These opinions get to the heart of the issue of this case, and will not be excluded.

2. *Opinions 3 and 4: Manzari's opinions that Class Vehicles suffer from a Shifter Defect that GM did not repair during the Warranty Period*

GM lumps Opinions 3 and 4 together, arguing that such opinions lack "independent analysis," are unreliable, and opine on areas that are within the province of the judge (legal conclusions) and the jury (factual questions).

As was the case where the court approved a virtually identical opinion of Manzari's, *see Harris*, 2020 WL 7318087, at *5, here, Manzari examined various documents pertaining to Plaintiff's vehicle—including (1) GM's warranty history for Plaintiff's vehicle; (2) Plaintiff's vehicle purchase records; and (3) the dealership service records for the vehicle owned by Plaintiff—as well as GM's own documents in this action and in *Napoli-Bosse v. General Motors LLC*, No: 3:18-cv-01720-MPS (D. Conn.). This Court similarly finds these opinions to be result of a reliable methodology reliably applied to a sufficient set of facts. *See e.g.*, *Harris*, 2020 WL

7318087, at *5; *Grover*, 2022 WL 205249, at *7-8; *Baker*, 2021 WL 1577837, at *5. The opinions involve application of his knowledge and expertise in concluding that certain repair attempts did not actually repair the defect. (ECF No. 43-3 at 27-28). As such, GM's motion to exclude Manzari's opinion that Class Vehicles suffered from the Shifter Defect that was not repaired during the Warranty Period is denied. To the extent that GM disagrees with the factual bases for Manzari's opinion, that is a matter for cross-examination at trial. *Grover*, 2022 WL 205249, at *8.

### 3. Opinion 5: Manzari's opinion that Class Vehicles are unsafe to drive

Manzari's opinion that the Class Vehicles are unsafe to drive is an "ordinary purpose" opinion. GM claims such an opinion is excludable because Manzari is not a vehicle safety expert. But "[a]n expert need not have complete knowledge of the field in question as long as the knowledge possessed will assist the trier of fact." *Bible v. Wal-Mart Stores*, 977 F.2d 580 (Table), at *2 (6th Cir. 1992). As discussed, and as found by multiple other courts, "Manzari is qualified by virtue of his knowledge and experience to testify on the functioning of the vehicles[]." *Loy*, 2022 WL 2340568, at *6; *see, e.g.*, *Bryant*, 2022 WL 420874, at *4; *Mize*, 2021 WL 5571165, at *5-6; *Harris*, 2020 WL 7318087, at *7. As such, GM's motion to exclude this opinion is denied.

### 4. Opinions 6-8: Manzari's opinions that the Shifter Defect would have impacted consumers' purchasing decisions and does impact the value of the Class Vehicles due to the cost of repair

GM mounts a variety of challenges to Opinions 6-8 as damages opinions, but this Court has already set aside most of these arguments in its other findings. Specific to these opinions, GM takes issue with the "anecdotal" nature of Manzari's opinions regarding any alleged reduction in value and any resulting consumer behaviors.

Opinions 7 and 8 are not to be excluded. As discussed *infra*, Section III.B(2), cost of repair is the appropriate calculation for diminution in value damages, as Manzari notes, and the repair cost is in part based on GM's records. As Manzari is qualified to provide damages calculations

based on his knowledge and expertise, his citations to evidence in the record in coming to the precise number are reliable. *See, e.g.*, *Loy*, 2022 WL 2340568, at *6; *Mize*, 2021 WL 5571165, at *6. And, considering GM itself fronts the cost to fix this issue during the warranty period, it was reasonable to conclude that such an issue impacts the Class Vehicles' value.

But Opinion 6 is different. In concluding that "most consumers would not have purchased the Class Vehicles, or would have paid substantially less, had the problem been known to them," Manzari starts to depart from the province of what this Court views as his expertise, instead veering into consumer demands, with more support. While not as "sweeping" as his similar statement in *Harris*—wherein Manzari opined that *no* consumer would have purchased the Class Vehicle with the alleged defect—Manzari's report here still lacks evidence of "consumer reactions" or evidence beyond "his subjective opinion." *Harris*, 2020 WL 7318087, at *8. This Court therefore rejects Opinion 6. The message conveyed by this opinion is properly captured in Opinions 7 and 8, which are allowed in.

### 3. Conclusion

In sum, GM's motion largely reflects a reality of litigation: "[GM] sees this case in one light; Manzari sees it in another. That a defendant disagrees with a plaintiff's expert's conclusions is not surprising, nor is it a basis for excluding that plaintiff's expert." *Bryant*, 2022 WL 420874, at *4. But instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"—tools available to GM at trial. *Daubert*, 509 U.S. at 596. Therefore, GM's Motion to Exclude is **GRANTED IN PART AND DENIED IN PART**: **GRANTED** only as to Opinion 6 and **DENIED** as to the others.

### III. MOTION FOR SUMMARY JUDGMENT

Because a request for class certification could possibly be rendered moot by the decisions as to summary judgment, this Court next considers summary judgment. And foundational to this Court's analysis of summary judgment is that, per the above, Manzari's report is admissible expert evidence. The rest of this opinion proceeds accordingly.

#### A. Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). This Court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. 242, 251-52 (1986)).

#### B. Analysis

##### 1. *Privity of Contract*

In GM's view, there exists no privity of contract between Plaintiff and GM, which dooms Plaintiff's breach of contract claim. (ECF No. 46-1 at 11). But in Plaintiff's view, privity is: (1) not required since Plaintiff seeks to enforce an express warranty; and/or (2) established by the Limited Warranty issued by GM and applicable to Plaintiff. (ECF No. 49 at 14-17). This Court opts to consider this issue first, as it feeds into the others.

At the motion to dismiss stage of this case, this Court waded into the potentially murky waters surrounding a breach of express warranty claim versus a breach of contract claim, and how to navigate the claims' coexistence. (*See* ECF No. 17 at 11, 19-20). Interpreting the facts in a light most favorable to Plaintiff, this Court interpreted Plaintiff's breach of contract claim as seeking to enforce the Limited Warranty, as opposed to the purchasing agreement. In so finding, Plaintiff's breach of contract claim survived: Given that "[a] number of Ohio courts have recognized that privity is not required to impose liability for breach of an express warranty," *Risner v. Regal Marine Indust., Inc.*, 8 F.Supp.3d 959, 989 (S.D. Ohio Mar. 27, 2018), this Court found GM's privity argument to be "irrelevant" to such a claim, (ECF No. 17 at 19-20). Had it been the other stream, GM's lack-of-privity argument would likely have led to the claim's demise based on Plaintiff's (lack of) allegations about the dealer's relationship with GM. (*See* ECF No. 17 at 19).

This Court's sister court, operating under Ohio law, found a similarly situated plaintiff to be in privity with a different car manufacturer based solely on the standard limited warranty applicable to that plaintiff's car, thereby allowing an express warranty claim to survive a motion to dismiss. *See Roxy Home Improvement, LLC v. Mercedes-Benz USA, LLC*, No. 1:17-cv-01817, 2018 WL 1705800, at *5 (N.D. Ohio Apr. 9, 2018).

Applying these principles to Plaintiff's allegations, which this Court continues to view in his favor, Plaintiff's breach of contract claim is one seeking to vindicate his rights under the Limited Warranty—a legally distinct and allowable alternative theory of liability to his breach of express warranty claim. (*See* ECF No. 17 at 10, 19). As such, Plaintiff can maintain his breach of contract claim.

## 2. Evidence of Damages

GM argues that (1) Plaintiff has provided no evidence to support either of his two theories of damages—diminution in value and loss of use—so (2) Plaintiff necessarily failed to disclose his damages computation, and therefore (3) the breach of contract and express warranty claims must be dismissed. (ECF No. 46-1 at 7-11). In response, Plaintiff points to his initial disclosures, interrogatory responses, and Manzari's expert report as evidence that he both disclosed and alleged damages. (ECF No. 49 at 3).

Manzari's admissible expert report explained that the cost of repair for Class Vehicles is "approximately $700." As cost of repair is the appropriate measure of damages for diminution in value,[2] this Court rejects GM's argument that Plaintiff provided *no* evidence of damages on this theory. Instead, Plaintiff has adequately and precisely set out one type damages as required and has revealed, at least, a genuine dispute of material fact "as to the presence and dollar value of damages when construing all inferences in favor of the Plaintiff." *Jefferson*, 344 F.R.D. 175, 190 (W.D. Tenn. May 11, 2023) (citing *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014)), *modified on reconsideration on different grounds in* 2023 WL 5662596 (W.D. Tenn. Aug. 31, 2023) (hereinafter *Jefferson*).

But loss of use is separate from diminution of value. And here, this Court need not even reach the question of whether Plaintiff adequately calculated loss of use damages because he failed to offer evidence from which a reasonable juror could find loss of use. *See Princeton Radiology Assocs., PA v. Advoc. Radiology Billing & Reimbursement Specialists, LLC*, No. 2:19-cv-2311, 2022 WL 501205, at *2 (S.D. Ohio Jan. 3, 2022). Setting aside the diminution in value addressed

---

[2] *Pag Holdings v. Love*, 2d Dist. Greene No. 12CA0012, 2012-Ohio-3388, ¶ 9 (2d Dist.); *Martin v. Constr. Servs., Inc.*, 121 Ohio St. 3d 66, ¶ 14, 2009-Ohio-1, 902 N.E.2d 10 (Ohio 2009); *Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238, 248-49, 140 N.E. 356 (Ohio 1923).

above, the only other hiccups Plaintiff alleges with his Class Vehicle are the two occasions on which he had the Subject Vehicle serviced for the Shifter Defect. But Plaintiff detailed no resulting loss of use, as he either was provided with a rental car free-of-charge or resumed using his Class Vehicle after waiting at the dealer. (Riley Tr., ECF No. 43-7, 188:15-189:22). As was the case in *Jefferson*, even under the summary judgment standard for construal of facts in the light most favorable to Plaintiff, Plaintiff's loss of use damages do not survive summary judgment.

### 3. *Magnuson-Moss Warranty Act Claim*

GM's only challenge to Plaintiff's Magnuson-Moss Warranty Act claim is premised on their "no evidence of damages" argument evaluated above. As explained, Plaintiff adequately alleged and disclosed damages under a diminution in value theory, so this Court necessarily forecloses this argument as applied to Plaintiff's Magnuson-Moss Warranty Act claim.

### C. Conclusion

For the reasons set forth above, Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. Summary Judgment is **GRANTED** as to Plaintiff's claims regarding loss of use damages. Summary Judgment is **DENIED** as to Plaintiff's breach of contract and breach of express warranty claims, and Plaintiff may proceed under a diminution of value theory of damages.

## IV. MOTION FOR CLASS CERTIFICATION

As Plaintiff's claims survive summary judgment in accordance with the above, the Court continues on to consider Plaintiff's request for class certification.

### A. Legal Standards

A plaintiff seeking class certification bears the burden of establishing compliance with all four requirements of Rule 23(a), referred to by the shorthand of "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy." Fed. R. Civ. P. 23(a); *Alkire v. Irving*, 330 F.3d 802, 820 (6th

Cir. 2003). In addition, under Rule 23(b)(3), class certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (referred to by the shorthand of "predominance and superiority").

And even though Rule 23 has no express ascertainability requirement, the Sixth Circuit has held that it is implicitly required for class certification. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016). Ascertainability is met where the "class description [is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Cole*, 839 F.3d at 541 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)). Where a class definition is insufficient on its face, "the court may construe the complaint or redefine the class to bring it within the scope of Rule 23." 7A Charles Alan Wright, et al., Federal Practice and Procedure § 1759, at 130-31 (3d ed. 2005).

In ruling on a motion for class certification, a district court should generally not consider the merits of the plaintiffs' claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). That said, on occasion, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *see Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982), and the required "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims," *Wal-Mart Store, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). A court, however, should not conduct free-ranging merits inquiries at this stage; it should consider the merits only to the extent "they are relevant to determining whether the Rule 23 prerequisites for

class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

## B. Analysis

Based on the parties' briefing, there appears to be no challenge to numerosity or adequacy. Finding these to be more than satisfied under this Court's precedent, this Court focuses the rest of its analysis on the contested elements of class certification: the class definition, ascertainability, commonality, typicality, predominance, and superiority.

### 1. Class Definition and Ascertainability

Here, "[a]s in any federal suit, a claimant must have Article III standing." *United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342, 348 (6th Cir. 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). As the Sixth Circuit recently stated, "[s]ince a potential standing defect implicates the propriety of a class certification," a standing question is always "fair game" to consider. *Fox v. Saginaw Cnty. Mich.*, 67 F.4th 284, 292 (6th Cir. 2023). Beyond standing, claimants to a class action must also be ascertainable, which turns on the class definition: "[T]he court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young*, 693 F.3d at 538.

In an attempt to satisfy these requirements, Plaintiff proposes two class definitions:

1. Initial purchasers and lessees of new 2017-2019 GMC Acadia, 2019 Chevrolet Blazer, 2016-2019 Chevrolet Malibu, 2018-2019 Chevrolet Traverse, and 2016- 2019 Chevrolet Volt vehicles ("Class Vehicles"), who purchased or leased their vehicles in Ohio.
2. All persons or entities who (1) bought or leased a 2017-2019 GMC Acadia, 2019 Chevrolet Blazer, 2016-2019 Chevrolet Malibu, 2018-2019 Chevrolet Traverse, or 2016-2019 Chevrolet Volt vehicle ("Class Vehicles") in Ohio; (2) sought a repair from a GM dealer regarding the "Shift to Park" condition (instances where the driver puts a Class Vehicle in the Park position however a 'Shift to Park' message appears) during GM's 36 month/30,000 mile warranty period; and (3) during the 36 month/30,000 mile warranty period did not receive a silicon-free replacement part.

14

(ECF No. 36-1 at 2).

For ease, this Court refers to the prior at the "Ohio Class" and the latter as the "Ohio Tailored Class." Because of the intertwined nature of standing, ascertainably, and the class definition, these issues are considered in tandem. In GM's view, both of Plaintiff's proposed classes fail: (1) his request to certify the broader Ohio Class should be denied because "many absent class members never experienced the STP condition and never sought a repair" and therefore have no actual injury or Article III standing; and (2) the Ohio Tailored Class faces insurmountable ascertainability issues due to member-specific fact finding.

Given both parties' engagement with and similarities between this case and *Jefferson*, it is worth noting that the *Jefferson* litigation has evolved in relevant ways since the parties' briefing. In May of last year, the *Jefferson* court certified a class of "purchasers and lessees of all 2017-18 GMC Acadias" after concluding that Plaintiff had "proposed a 'fail-safe class'" in proposing a class much like the Ohio Tailored Class here. *Jefferson*, 344 F.R.D. at 195-96. Supporting its finding, that court explained that Plaintiff "defined the class such that 'whether a person qualifies as a member depends on whether the person has a valid claim,'" which is problematic because such a class "'cannot be defined until the case is resolved on its merits' and is therefore impermissible." *Id.* (citations omitted). But upon reconsideration at Plaintiff's urging, the court corrected its prior ruling, instead finding that "Plaintiff … proposed a proper, not a fail-safe, class" "because all facts that must be determined to establish membership in Plaintiff's proposed class can be objectively determined without any decision on the merits of her case." *Jefferson v. General Motors, LLC*, 2023 WL 5662596, at *3 (W.D. Tenn. Aug. 31, 2023) (citing *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015)).

At the March 19, 2024, oral argument, GM indicated that this Court had to pick one of two paths to follow: the path of *Jefferson*, which it asserts is incorrect, or the path of *Fox v. Saginaw*, 67 F.4th 284 (6th Cir. 2023), and *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013), which it urges this Court to follow based on the Sixth Circuit's acceptance of 23(f) petitions in related cases like *Speerly v. General Motors* (6th Circuit Case No. 23-1940). This Court is not persuaded for two reasons. First, this Court views *Jefferson* as either consistent with or distinguishable from *Fox* and *In re Whirlpool* on standing and predominance. Indeed, *Jefferson* explicitly relied on *In re Whirlpool* in finding a conflict between former and current owners, 344 F.R.D. at 193, which this Court's class definition, and the reconsidered *Jefferson* class, reflects, 2023 WL 5662596, at *3. *Fox* found issues with the plaintiff's standing and predominance given that the plaintiff was suing 27 counties, 26 of which objectively did not injure him. 67 F.4th at 293, 300. This is not the case here, where Mr. Riley is suing the only manufacturer who could be liable for his injuries. Second, until and unless the Sixth Circuit disclaims the logic in *Jefferson* as a result of a 23(f) petition, or other avenue for relief, this Court is not inclined to stray from its agreement with Jefferson based on existing precedent.

Here, Plaintiff proposes two class definitions: one in line with what the *Jefferson* plaintiff proposed and one aligning with the definition originally adopted by the *Jefferson* court. Barring no persuasive reason to diverge from a sister court's treatment of the same issue under equally binding Sixth Circuit precedent, this Court similarly adopts a slightly modified version of the Ohio Tailored Class (hereinafter the "Defined Class"): (1) Initial purchasers and lessees of new Class Vehicles—2017-2019 GMC Acadia, 2019 Chevrolet Blazer, 2016-2019 Chevrolet Malibu, 2018-2019 Chevrolet Traverse, or 2016-2019 Chevrolet Volt vehicle—who purchased or leased their vehicles in Ohio; and who (2) sought a repair from a GM dealer regarding the Shifter Issue during

the warranty period; and who (3) were not provided with either a silicon-free replacement part (the "defined class").

Having defined the class in a way that moots GM's standing argument, the question turns to ascertainability. Much like in *Jefferson*, the Defined Class overcomes the ascertainability hurdle. Each of the three prongs "can be objectively determined without any decision on the merits of her case" such that inclusion in the Defined Class alone does not establish liability. *Jefferson*, 2023 WL 5662596, at *3 (citing *Rikos*, 799 F.3d at 525, and *Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017)). During the course of litigation, in order to succeed as the Defined Class, Plaintiff must prove "whether there was a defect and whether [GM's] alleged failure to repair that defect or replace parts … constituted a breach of warranty." *Id.*

And this Court is not concerned with the administrative tasks potentially required to identify members of the Defined Class. As Plaintiff suggests, much of the class can be identified through GM's own records—records GM testified to having and to producing to Plaintiff. (*See* Markovits Decl., ECF No. 36-4, ¶ 11; ECF No. 36-32 at 9). Regarding a question of "presentment" as an ascertainability determination, an individual properly "presented" the Shifter Issue to a dealer so long as the Shifter Issue was raised while their vehicle was being serviced—that is, the Shifter Issue need not have been the only, or even the main, reason the individual was at the dealer in the first place. While GM's expert, Mr. Steven Gornick, reported that determining whether individuals sought or received Shifter Issue repairs would be an "individual[]" analysis, this Court understands this identification process to be relatively simple. (ECF No. 42-4 at PageID 1180–81).

To the extent more is required to encompass potential class members whose requests for service were misplaced, the analysis of additional documentation, such as affidavits from the vehicle purchaser or lessee, still falls within the scope of an allowable process. *See Rikos*, 799 F.3d

at 526 (deeming "substantial review" necessary for an ascertainability analysis); *see also Young*, 693 F.3d at 539 (finding ascertainability despite the "large number of individual determinations"). The Sixth Circuit has even upheld the use of a special master to review individual claims. *See Rikos*, 799 F.3d at 526. Indeed, "[i]t is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies." *Young*, 693 F.3d at 540. Through the tools available to the parties, this Court is certain that the Defined Class can be ascertained "with reasonable—but not perfect—accuracy." *Rikos*, 799 F.3d at 526.

### 2. Commonality

The commonality inquiry requires demonstration of two things: (1) that "the class members have suffered the same injury"; and (2) that such injury "is capable of classwide resolution[.]" *Dukes*, 564 U.S. at 349-50 (internal quotation marks omitted). This Court need not belabor this analysis, as commonality is easily satisfied based on the numerous common questions of fact and law. At their core, the claims of all prospective Defined Class members are premised on the same alleged defect, are covered by the same warranty, and turn on the same questions of liability— questions resolved as applied to all class members, not individual vehicles. *See, e.g., Jefferson*, 344 F.R.D. at 192; *see also Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006).

### 3. Typicality

Having found commonality is satisfied, it is worth noting that although the inquiries remain distinct, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 349 n.5. Such is the case here, as Plaintiff's claim is also typical of the Defined Class. This Court's modifications to the class definition to include initial purchasers and lessees of new Class

Vehicles resolve GM's concerns about inclusion of lessees or former owners, thereby mitigating any potential conflict there. (*See* ECF No. 42 at 30). Otherwise, given the questions at issue in this litigation, this Court is not aware of any conflicts of interest, and Plaintiff "possess[es] the same interest and suffer[s] the same injury as the class members." *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)).

### 4. Predominance

A class action may be maintained only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). GM attacks Plaintiff's attempt to establish as much from two angles: (1) individualized findings of liability; and (2) individualized damages calculations. (*See* ECF No. 42 at 18-22).

Plaintiff alleges that "GM failed to repair the Class Vehicles' Shift to Park Defect in violation of its limited warranty," (ECF No. 36-1 at 19), which this Court interprets as alleging that "*no* Class Vehicle received a silicon-free repair within a reasonable period of time," *Jefferson*, 344 F.R.D. at 194. As established in the commonality and typicality analyses, the fundamental questions at issue are whether the Class Vehicles' shifters were defective in a way that is covered by the Limited Warranty and, if so, whether this reduced the Class Vehicles' value. As to the value point, Plaintiff's qualified expert quantified the diminution in value, which this Court accepted, so that cannot be considered an individual question, let alone one that would warrant "fact-specific damage trials." *Fox*, 67 F.4th at *301; *supra* Section III.B(2). While there may be smaller, one-off questions along the way, given that the evidence necessary to answer these key questions is common among the Defined Class, predominance is satisfied.

And concluding as much does not "sweep away evidentiary arguments," as defense counsel

suggested at the March 19, 2024, oral argument. This Court is hard-pressed to find that there is no "defect" in the cars that manifested a Shifter Issue, as GM does not argue that the issue was not happening—nor could they, given the technical service bulletins and mass of customer complaints. Therefore, whether a vehicle experienced the Shifter Issue is not a merits question of liability that would otherwise be inappropriate to consider at this stage—it is a yes or no question based on, in the majority of cases, GM's own records. *Contra Fox*, 67 F.4th at *301.

### 5. Superiority

Lastly, Plaintiff must demonstrate "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Having set aside GM's related concerns vis-à-vis the above conclusions that Plaintiff has established commonality, typicality, and predominance of liability and damages, this Court is similarly unpersuaded here. Where, as here, "individual suits would yield small recoveries" and "the liability issue predominates," "litigation should be brought as a class action[.]" *Jefferson*, 344 F.R.D. at 195 (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007)).

## C. Conclusion

Finding all of the elements of Rule 23(a) and 23(b)(3) satisfied, Plaintiff's Motion for Class Certification is **GRANTED**, and this case is set to proceed as a class action.

## V. CONCLUSION

For the reasons set forth above, this Court orders the following. First, GM's Motion to Exclude (ECF No. 43) is **GRANTED IN PART AND DENIED IN PART**: **GRANTED** as to Opinion 6 and **DENIED** as to Opinions 1, 2, 3, 4, 5, 7, and 8. Additionally, GM's Motion for Summary Judgment (ECF No. 46) is **GRANTED IN PART AND DENIED IN PART**: **GRANTED** as to Plaintiff's claims regarding loss of use damages and **DENIED** as to Plaintiff's

breach of contract and breach of express warranty claims, so Plaintiff may proceed under a diminution of value theory of damages. Lastly, Plaintiff's Motion for Class Certification (ECF No. 36) is **GRANTED**.

   **IT IS SO ORDERED**.

                  **ALGENON L. MARBLEY**
                  **CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: March 25, 2024**